## McGinniss *versus* Sawyer.

## Same *versus* Millar *et al.*

1. The general rule as to the admission of a copy of an instrument is, that it should be proved by some one who has compared it with the original.

2. The evidence in this case insufficient to admit the copy.

3. A party relying upon an entry to bar the Statute of Limitations, should show with reasonable certainty the time when the entry took place.

November 13th 1869. Before THOMPSON, C. J., READ, AGNEW, SHARSWOOD and WILLIAMS, JJ.

These were writs of error to the Court of Common Pleas of *Allegheny county:* No. 143 and 144, to October and November Term 1869.

In the court below two writs of ejectment were issued, February 29th 1868. One by Alexander C. McGinniss and William McGinniss against Edward McGinniss for three acres of land in Chartiers township: on the 7th of December, Benair C. Sawyer, vendee of the plaintiffs, was substituted as plaintiff. The other writ was at the suit of Alexander Millar and Charles Millar against the same defendant for about 118 perches of land in the same township. The two lots adjoined each other. Both cases depending on the same evidence, they were tried together.

In 1838 Jeremiah Dunlevy owned a tract of about 26 acres

[McGinniss v. Sawyer.]

of land, part of which was called the West Elliott tract, which he sold to Joseph Gunther, Francis Snyder and Nicholas Snyder. They went into possession and made parol partition of the tract; Gunther's part adjoined David Noble and on the line between them Gunther put up a fence; in 1839 he sold his part to William McGinniss. On the 12th of June 1840, Noble conveyed his tract to Edward McGinniss. On the 5th of April 1860, William McGinniss conveyed 118 perches of his tract to Alexander Millar, William J. Millar and Charles Millar. On the 6th of August 1862, H. Woods, sheriff, conveyed the interest of William McGinniss to H. Baker and Jacob Henrici, who on the 12th of September 1865 conveyed to Alexander C. McGinniss and William McGinniss, Jr.; they, August 1st 1868, conveyed to Benair C. Sawyer. The land in dispute is on the line between Gunther and Noble, now Millar and Sawyer, on the one side and Edward McGinniss on the other. There had been two ejectments previously for the land, in the first, brought February 5th 1862 by Edward McGinniss, there was a verdict for the defendants, May 17th 1864. The second suit was brought by Edward McGinniss, May 31st 1864; the verdict and judgment were for the plaintiff and possession was delivered to him by the sheriff November 1st 1866. The whole question is dependent upon the proper location of the line between the parties, which commenced at a point, designated as the Lorenz corner.

The plaintiffs claimed that the line ran from the Lorenz corner, north 43¾° east to the river : the defendant claimed that the line from the Lorenz corner, ran north 50° east to the river. The principal question in the case being as to the title under the Statute of Limitations.

On the trial of the case, December 7th 1868, before Sterrett, P. J., the plaintiffs gave the following evidence as to a survey or plot, spoken of as the " Steele survey."

Condorcet McGowan testified :—

" Am engineer and surveyor; am brother of R. E. McGowan, deceased; was acquainted with Z. W. Remington; have been surveying for about 28 years. I have a plot of lots made for McGinniss and Snyder by Remington in 1849. This is a copy made by myself from the original. I have a copy of the Steele survey among my papers, but I have not had time to find it. This Steele plot or draft was in possession of Remington, and afterwards of my brother. * * * In 1849 I assisted my brother, R. E. McGowan, in running the line; he ran then as I did myself afterwards."

Being recalled, he testified :—

" I examined for the copy of the Steele survey of the river hill lots; found it—have it in my hand; it had got mixed up among other papers. This copy is in the handwriting of my brother, R.

[McGinniss v. Sawyer.]

E. McGowan, now deceased. It was copied off a plan supposed to be the original in the hands of Z. W. Remington. I may have seen the original, but will not be positive. Don't know that I have any right to answer what became of the original and other papers in Remington's possession; I believe Remington burned them up—didn't see him doing so. The date of this copy is as appears on its face—' Copied Dec. 3d 1835,' is in the handwriting of R. E. McGowan. I first saw this copy in 1841 or 1842, and it has been in my possession ever since, only when it was in court. At the time I first saw it, it was in possession of Remington & McGowan; they were in business together at that time. I have surveyed part of the John Elliott land; have surveyed the river hill lots from Saw-mill Run to Cork's Run. In my surveys I found marks upon the ground showing that a survey had been made upon the ground about 1810—trees marked at that time. If they were blocked, they would count back to that date—trees standing still."

N. Patterson testified :—

" I saw a plan of the river hill lots, purporting to have been made by David Steele; had seen Steele's signature to different surveys; he was a surveyor in this county in olden times; the plot purported to have been made some time before 1820. I have surveyed some of the river hill lots by what I took to be the old plan; this was about 1833, for John M. Snowdon; he went out west; don't know that he is dead. I would take this to be a copy of the original, or what I took to be the original, in the handwriting of Steele. In running the river hill lots I find the lines on the ground to correspond with the draft; these marks on the ground, corresponding with the plan, satisfied me that the survey had been made upon the ground."

James Trunick testified :—

" Knew David Steele. He followed surveying. I owned at one time a part of the West Elliott tract. In 1834 I bought some of the river hill lots. I went to D. Frew, executor of West Elliott, and got Steele's plot of 1807 of the whole tract of West Elliott land, showing the subdivision of the whole tract—Elliott's Delight —including the river hill lots, 12 in number; No. 1 beginning at Edward McGinniss' land and numbered up to No. 12, at the John Elliott line. Major Patterson and I had that plot when he was running the line of my lots. I think Patterson had the plot afterwards, I think in 1837, to survey for John M. Snowden, and then in 1839 Z. W. Remington got it. I think it was 1807 the plot bore date—it might have been 1809; there was a blot on the figure and I took it to be 1807. I never saw this plot, but think it corresponds with the original in sizes and shapes of the lots."

E. H. Heastings testified: (witness shown Steele's plan of the river hill lots) :—

[McGinniss *v.* Sawyer.]

"I think I have seen this plan before. From my surveys on the ground and the description in the Shamway deed of the lots, I think this plan represents correctly the river hill lots. I saw the original plan; I should take this to be a copy of this original plan. I believe the original plan was burned, from the circumstance: At the time R. E. McGowan had a lawsuit with Remington, Remington came to me after the lawsuit and wanted me to take his place, books, papers, office, &c., and I declined; at the same time or afterwads he intimated that the papers were pnt out of the road, so that there would be no more lawsuits about them. I got the impression—whether from what he said or not, I cannot say—that they were burned in the back-yard. Remington went out west; don't know where he is—whether he is living or dead; I heard that he was living, and heard also that he was dead. I have seen this plan two or three times; saw it lately, I think, in another case."

Plaintiffs offered in evidence the copy of the river hill lots referred to by the last witness and others. Defendants object to the offer, 1st, because the copy is not sufficiently authenticated; 2d, that the loss of the original, of which this purports to be a copy, is not sufficiently proved; 3d, because it is incompetent and irrelevant.

The evidence was admitted by the court and a bill of exceptions sealed.

Peter Brady, who had been engineer of the Pittsburg and Steubenville Railroad, which passes through the land of both McGinnisses, testified that in running the line of the railroad and supervising its construction about 1853 and 1854; he found the line fence between the parties where the plaintiffs claim that it should be; that the defendant was on the ground with witness when he staked off about an acre of land on defendant's side of the fence, for a "borrowing pit," allowing some distance from fence for slope; defendant was there by appointment of the chief engineer, witness told him they wanted to keep far enough from the fence so as not to let it fall and to take all the pit from his ground; defendant made no objection and said nothing about the line. William McGinniss then claimed up to the fence from the other side; the fence appeared to be of some age; the posts were decayed.

William McGinniss under objection and exception testified: that when he purchased the land in 1839, Noble claimed up to the fence and the witness down to it; when railroad damages were assessed he and Edward, who had bought of Noble, claimed in the same way, and the damages were so paid to them respectively. At one time Edward moved the fence over on witness and the next morning witness tore it down and put it back into the old post holes; witness did not know how long before the first suit against

[McGinniss v. Sawyer.]

him it was that the fence was torn down; witness always claimed to the fence; there was no dispute about the fence till since the sale to Millar.

Owen McGowan testified that in 1856 or 1857 under the direction of Edward McGinniss he moved the fence 12 or 14 inches over on Williams side.

There was much other evidence given by the plaintiffs tending to show an adverse holding of the land in dispute by themselves and their predecessors for such a length of time as to give them title by the Statute of Limitations.

The defendants gave evidence by a number of witnesses that about the line of these tracts there was a piece of sunken ground and that the line fence was over one end of this sunken ground; this would bring the line to the place claimed by the defendant. There was also much other evidence by the defendant tending to show that the line was where he claimed it to be, and to establish other marks than the sunken ground. There was also a large amout of documentary evidence and evidence bearing upon questions other than the Statute of Limitations, given by both parties.

In the course of the trial witnesses were offered by the plaintiffs, objected to an account of interest, and admitted under exception.

The court charged :— * * *

" A great deal of testimony has been given in relation to lines of different surveys, and a number of deeds have been given in evidence by both parties, but in our judgment this amounts to nothing, so far as showing a paper title in either party is concerned. In short, neither party has shown a paper title to the land in controversy, and it is unnecessary to embarrass your inquiry by any explanation on this point. Neither of the plaintiffs is entitled to your verdict upon the strength of the paper title given in evidence. But we do not mean to withdraw from your consideration the surveys, plots and other papers given in evidence. So far as these, taken in connection with the other testimony in the cause, may assist you in determining the point up to which the respective parties held and occupied, you can avail yourselves of them.

" The plaintiffs can claim your verdict only on two grounds, either of which, if sustained by the testimony, will entitle them to recover.

" 1st. That they, and those under whom they claim, have had exclusive, peaceable, continuous, notorious and adverse possession of the land in controversy for a period of more than twenty-one years prior to the 31st day of May 1864, the time the second suit was brought in the District Court; or.

" 2d. That the line to which the plaintiffs claim, and on which they allege the division fence was erected and maintained—running from the Lorenz corner north 41¾° east to the river—was recog-

nised as a division line by them and those under whom they claim, as well as by the defendant and those under whom he claims, for a like period of more than twenty-one years prior to the institution . of the second suit. * * *

" Keeping these propositions before you, then, apply the testimony to them and ascertain whether either of them is sustained by the evidence.

" The plaintiffs claim that immediately after Gunther and the Snyders purchased in 1838, they employed a surveyor and divided their land into three equal portions, so that each would have an equal front on the river ; that Gunther went into possession of his portion—being the lower part—built a fence on the line to which they claim, cultivated a portion of the land up to this fence in the spring and summer of 1839, and in 1840 sold to William McGinniss, who went into possession of the same immediately, built a house, kept up the fence on the same line, and continued to occupy and use the land up to the division fence, as he claimed it, for more than twenty-one years ; that during this period the land was used and occupied up to the line claimed by plaintiff as lands are usually occupied and used by owners ; that he cultivated portions of it, cut and sold timber off the wood land, pastured the upper and lower portions of it, used and rented the river landing below the public road ; that the Millars, who purchased a portion of the river front from him in 1860, used and occupied the same until they were ejected after the recovery in the second suit ; that the vendees of William McGinniss at sheriff's sale continued in possession in like manner as he had done. The plaintiffs have offered testimony tending to show all this, and unless it has been successfully met by the testimony of the defendant, the plaintiffs have made out a complete title under the Statute of Limitations, if their testimony is believed by you.

" On the other hand, the defendant contends that the division fence and line between the two tracts were not located where the plaintiff's witnesses have placed it, but on the line to which he claims—the line running north 50° east, through the lower end of the sunken ground, on striking the river about 15½ rods above the point to which the plaintiff claims, and the Lorenz line about 9 26-100 perches east of the plaintiff's starting point ; that the plaintiffs and those under whom they claim, did not occupy and use the land in controversy, as claimed by them ; and they have offered testimony tending to prove this state of facts. Whether they have done so or not is for you to say, from all the evidence before you. * * * The location of the division fence is the great question in these causes, and it must be admitted that there is a great conflict of testimony in regard to it. It is your special province to decide it, and say by your verdict what the fact is.

[McGinniss v. Sawyer.]

" Under the evidence it would appear to be highly improbable, if not .impossible, for two fences to have been located on these respective lines at the same time. No witness in the cause even intimates that there were ever two fences at the point in question running from the public road up the hill to the Lorenz line. [The plaintiff's counsel contend that the testimony of Peter Brady, as to the connected map made by him at the time the railroad was being constructed, showing the lines of the different land-owners through which the road passed, verified by his recent measurements upon the ground, and corroborated by other testimony in the. cause, establishes conclusively that the division fence was on the line claimed by them at that time, viz.: in 1854 or 1855, and that there is no evidence to show that it had ever been removed from where the defendant alleges it was located to that point. On the other hand, the defendant's counsel contend that their testimony fixes the location of the division fence at the point claimed by him, through the end of the sunken ground.]

" [The second proposition on which we have said the plaintiffs may recover, if it is sustained by the evidence, viz: a fence on the location claimed by them, recognised by the parties on each side as a division fence for a period of over twenty-one years, &c., depends mainly on the same testimony. It will avail the plaintiffs nothing to show that there was a division fence which the parties on each side recognised as such, unless they show that it was located on the line to which they claim. * * *

" If you find that the division fence was located and maintained on the line claimed by the plaintiffs, there is no evidence of any entry by the defendant that would interrupt the running of the Statute of Limitations in favor of the plaintiff prior to the institution of the second suit. There is some evidence that at one time the defendant moved the fence over some twelve or fourteen inches on William McGinniss, but this would not affect the plaintiff's right to recover, so far as the Statute of Limitations is concerned.]"

The verdicts were for the plaintiffs.

The defendant removed the cases to the Supreme Court and assigned for error: the admission of the copy of the Steele plot; the portions of the charge in brackets and the admission of the witnesses objected to on the ground of interest.

*M. W. Acheson* and *J. R. Large*, for the plaintiff in error.—As to the admission of the copy of the Steele plot, proof of loss and search for original should have been made : Parke v. Bird, 3 Barr 360; the existence of the original, its destruction or unavailing search for it: Porter v. Wilson,1 Harris 641 ; Murray v. Buchanan, 7 Blackf. 549.  The copy should have been testified to by one who had compared it with the original: Kerns v. Swope, 2 Watts 75.

[McGinniss v. Sawyer.]

There should have been clear proof of the contents of the original: McBurney v. Cutter, 18 Barb. 209; Catlin v. Underhill, 4 McLean 199; Smith v. Carrington, 4 Cranch 62. As to the second error. In commenting upon evidence, everything on the point should be brought to the notice of the jury: Nieman v. Ward, 1 W. & S. 82. The court should not have led the jury to think there was but one point, when there are two: Relf v. Rapp, 3 W. & S. 21; Parker v. Donaldson, 6 Id. 32; Brown v. Clark, 2 Harris 469; Gregg Township v. Jamison, 5 P. F. Smith 468.

*R. Woods* and *N. P. Fetterman*, for defendants in error, as to the admission of the copy of the plot cited: Ralph v. Brown, 3 W. & S. 395; Porter v. Wilson, 1 Harris 641; Flinn v. McGonigle, 9 W. & S. 75; Bouldin v. Massie, 7 Wheaton 122; Cotton v. Huidekoper 2 Penna. R. 152; Devling v. Williamson, 9 Watts 316. As to the 3d specification: there was no evidence of entry within 21 years; it would have been error to submit the question to the jury: Stafford v. Henry, 1 P. F. Smith 514; Urket v. Coryell, 5 W. & S. 60. The defendant could not have been injured if it was error, the court therefore will not reverse: Ormsby v. Ihmsen, 10 Casey 462; Newman v. Edwards, Id. 32; Bain *v.* Doran, 4 P. F. Smith 124.

The opinion of the court was delivered, January 3d 1870, by

SHARSWOOD, J.—The first assignment of error is, that the court below erred in receiving in evidence, the copy of a survey alleged to have been made by David Steele. We may assume that such a survey had been made as early as 1807 or 1809—that the original of that survey was traced to the possession of Remington, who had left the state and not been heard from for several years, so that sufficient ground was laid for the introduction of secondary evidence: Ralph *v.* Brown, 3 W. & S. 395; Flinn v. McGonigle, 9 W. & S. 75. Its absence might then be supplied either by parol evidence of its contents or by a copy. No offer or attempt was made to give parol evidence of its contents. No witness, who had seen the original, was asked to testify from recollection what the course of the line in controversy was as marked upon it. The person, by whom the copy offered is said to have been made, was deceased. No one testified that he had ever compared the copy with the original. McGowin, who said that the copy was in the handwriting of his deceased brother, and that it was taken from a draft supposed to be the original in the hands of Remington, was unable to say that he had ever seen that supposed original. The testimony of Major Patterson was: " I would take this to be a copy of the original or what I thought to be the original in the handwriting of Steele;" and of Neastings: " I saw the original plan; I would take this to be a copy

of the original plan." To admit in evidence a copy upon testimony of this vague and loose character would be fraught with great danger to the rights of parties. The draft produced might profess to be and have all the appearance of a true copy, and yet as to the very matter upon which the whole controversy hinged, the course and distance of a single line, it may have been false or incorrect. The general rule of the law upon this subject requires that a copy in order to be admitted as secondary evidence, should be proved by some one who has compared it with the original: 1 Starkie on Ev. 270, 9th Am. ed. ; Kerns v. Swope, 2 Watts 75. We think therefore that there was error in the admission of this evidence.

There is nothing in that part of the charge which forms the subject of the 2d assignment of which the plaintiff in error has any just cause to complain. If the learned judge did not expressly state to the jury that it was part of his case that the fence had been moved from the sunken ground, it was necessarily implied. If the attention of the court had been called to the omission at the time, no doubt it would have been explained and supplied. We never reverse on exceptions of this kind, unless it is clear that the jury may have been misled.

The 3d specification relates to that part of the charge in regard to the effect of the entry, of which there was some evidence, to stop the running of the Statute of Limitations. From the position of this clause at the end of the charge, it may be conjectured that it was in answer to some point orally put by the counsel of the defendants below. It may be that there was some evidence of an interruption of plaintiff's actual possession, a break in its continuity, to a very small and unimportant extent—twelve or fourteen inches. It is evident, however, that the point to which the attention of the court was called was not this, but the effect of the entry upon the plaintiff's title by the Statute of Limitations to the entire premises in dispute. The testimony relied on to sustain this assignment is that of William McGinniss, who said : " at one time Edward McGinniss moved the fence over on one part of it, and next morning we tore it down and put it back in the old post holes ; at that time Edward claimed about 60 odd feet　*　*　* don't know how long it was before Edward brought the first suit against me." Now, considering this as sufficient evidence of a formal entry, and that Edward McGinniss had such a right or title as would make it available to him to stop the running of the Statute, Hole v. Rittenhouse, 7 Harris 305, it is necessary that he who sets up such an entry should show with at least reasonable certainty when it took place. The Act of Assembly of April 13th 1859, Pamph. L. 603, provides " that no entry upon lands shall arrest the running of the Statute of Limitations, unless an action of ejectment be commenced therefor within one year there-

after." Without evidence, then, ascertaining with some degree of precision, if not the exact day, at least that the entry was within the space of a year before Edward McGinniss commenced the first action of ejectment, the entry went for nothing. There was no evidence whatever to authorize the jury to infer this; and the learned judge below was therefore right in this part of his charge.

The three remaining assignments of error are to the admission of witnesses whose competency was objected to on the score of interest. We think that there was no error in the admission of these witnesses. It is unnecessary to discuss these assignments at length, because, as the cause goes back to be again tried, all objection to their competency is now removed in consequence of the change of the law of evidence introduced by the Act of Assembly passed April 15th 1869, Pamph. L. 30.

Judgment reversed, and *venire facias de novo* awarded.